

AO 91 (REV.5/85) Criminal Complaint                                      AUSA Rick D. Young (312) 886-7660

**FILED**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

MAY – 5 2011

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

v.

CASE NUMBER:

ADOLFO QUINTERO,
ISIDRO BUENROSTRO-MORO, and
ISRAEL MELCHOR-QUINTANA

# 11CR 0325

## MAGISTRATE JUDGE COX

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:  On or about May 4, 2011, at Carpentersville, and elsewhere, in the Northern District of Illinois, Eastern Division, ADOLFO QUINTERO, ISIDRO BUENROSTRO-MORO, and ISRAEL MELCHOR-QUINTANA, defendants herein:

did conspire to distribute a controlled substance, namely, 500 grams or more of a mixture containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.  I further state that I am a Special Agent with Immigration & Customs Enforcement, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
PAUL SCHEICH
Special Agent, Immigration & Customs Enforcement

Sworn to before me and subscribed in my presence,

May 5, 2011                                            at   Chicago, Illinois
Date                                                         City and State

SUSAN E. COX, U.S. Magistrate Judge
Name & Title of Judicial Officer                          Signature of Judicial Officer

UNITED STATES DISTRICT COURT     )
                                           )  ss

NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, PAUL SCHEICH, being duly sworn, state as follows:

1. The affiant is a Special Agent with the United States Department of Homeland Security, Homeland Security Investigation ("HSI"). I have been a Special Agent with HSI since June 2006. My previous federal law enforcement employment includes that of a Customs and Border Protection Officer with Customs and Border Protection ("CBP") and a Customs Inspector with CBP's predecessor, the United States Department of the Treasury, from approximately December 2002 until June 2006. In connection with my official duties as a Special Agent with HSI, I investigate criminal violations of the federal immigration laws, including but not limited to, Title 8, United States Code, Sections 1324, 1325, and 1326, and Title 18, United States Code, Sections 1028 and 1546. I have initiated and participated in criminal investigations involving the manufacture and distribution of fraudulent immigration documents, driver's licenses, and other identification documents. I have participated in criminal investigations involving undercover transactions, the execution of search and arrest warrants, the review of consensually recorded conversations, and various types of physical and electronic surveillance.

2. This affidavit is submitted in support of a criminal complaint alleging that ADOLFO QUINTERO, ISIDRO BUENROSTRO-MORO, and ISRAEL MELCHOR-QUINTANA have conspired to knowingly and intentionally distribute a

controlled substance, namely, 500 grams or more of a mixture containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of 21 U.S.C. § 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging these defendants with conspiracy to distribute a controlled substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3.     The information contained in this Affidavit is based upon my own personal observations and knowledge as well as information received from other Federal law enforcement officers, including other Special Agents and Task Force Officers. As a result of my participation in this investigation, I am familiar with all aspects of this investigation as described in this Affidavit.

## FACTS SUPPORTING PROBABLE CAUSE

4.     This investigation began in or about November 2010, after HSI agents and the Elgin Illinois Police Department received information that an individual later identified as ADOLFO QUINTERO was involved in the illegal sale of firearms, narcotics, and genuine identity documents, such as birth certificates and Social Security cards. Thereafter, an undercover agent (hereinafter referred to as "UCA") and a cooperating witness (hereinafter referred to as "CW")[1] met with QUINTERO on various occasions between November 2010

_____

[1] CW is a source who has been used by ICE agents in multiple investigations in the past. The information provided by CW in those investigations has been found to be reliable based upon,

and May 2011 for the purpose of arranging the purchase and purchasing identification documents, firearms, and controlled substances. As described in detail below, after purchasing identification documents and firearms from QUINTERO, QUINTERO negotiated and arranged for the purchase of three kilograms of cocaine in a transaction with ISIDRO BUENROSTRO-MORO and ISRAEL MELCHOR-QUINTANA on May 4, 2011.

### *Purchase of Identification Documents from Quintero*
### *and Offer to Sell Controlled Substances*

5.     On December 16, 2010, at approximately 5:53 p.m., UCA and CW met with QUINTERO at a residence on Clifton Avenue in Elgin for the purpose of purchasing identification documents and a firearm, namely, an AK-47 assault weapon.[2] QUINTERO and CW had engaged in discussions regarding the purchase of such items on prior occasions, including an in-person meeting between QUINTERO and CW on November 29, 2010 during which CW purchased a handgun from QUINTERO as part of an undercover investigation

---

among other things, a review of audio and video recordings made of conversations involving CW, surveillance conducted by ICE agents and other law enforcement officers, statements by other cooperating witnesses, the seizure of evidence, and the post-arrest statements of targets and subjects. CW is a foreign national and is being allowed to remain in the United States due to CW's cooperation with ICE agents.

[2] The descriptions of the conversations contained in this affidavit are based upon debriefings of the cooperating witness and the undercover agents involved in certain discussions as well as a review of the audio recordings. The descriptions of the conversations contained in this affidavit are not verbatim or a complete recounting of the conversations. They are merely summaries of the portions deemed pertinent to establish probable cause. The language used during most of the recorded conversations summarized below was Spanish. In such cases, Spanish speaking agents have translated relevant portions of the conversations into English. The descriptions of these conversations include the affiant's understanding of what was said based upon the content and context of the conversations, surveillance, debriefings, the affiant's experience as a law enforcement officer and the experience of other law enforcement officers in this investigation.

conducted by the Elgin Police Department. Prior to the meeting, ICE agents and other law enforcement officers established surveillance in the area of the Clifton Avenue residence and UCA had been equipped with an audio and video recording device.

6. During the meeting inside of the Clifton Avenue residence, QUINTERO introduced UCA and CW to an unidentified Hispanic male and told UCA and CW that this Hispanic male was the individual who provided him with identification documents. QUINTERO then handed a Texas Birth Certificate and a United States Social Security card, both of which reflected the name and personal information of another individual, to CW in exchange for $1,500 in government funds that CW previously obtained from ICE agents.

7. After exchanging the identification documents and money, UCA and CW waited in the residence for the arrival of a firearm that QUINTERO also promised to sell them. As they waited, QUINTERO appeared to place various phones calls and text messages in an apparent attempt to contact his source regarding delivery of the firearm. During this time, QUINTERO told UCA and CW that he could supply them with large quantities of controlled substances, including kilograms of cut cocaine at $22,000 per kilogram, kilograms of uncut cocaine at $29,000 per kilogram, and kilograms of heroin at $70,000 per kilogram.

8. UCA and CW left the Clifton Avenue after approximately one hour without obtaining the firearm. At the time of their departure, QUINTERO told UCA and CW that

his supplier had been delayed and that his supplier would be able to deliver the firearm on the following day.[3]

### *Additional Discussions with QUINTERO to Purchase Firearms*

9.     On March 25, 2011, CW placed an unrecorded call to QUINTERO at a telephone number that had previously been used to contact him. According to CW, during the ensuing call, CW recognized the voice of the person answering the call as voice of QUINTERO based upon their prior meetings and discussions. QUINTERO informed CW that he had firearms and identity documents available for sale, and that CW could purchase the items as soon as CW wanted the items. The two agreed to meet the following day at QUINTERO's residence.

10.     The following day, on March 26, 2011, at approximately 12:30 p.m., CW met with QUINTERO at the residence on Clifton Avenue in Elgin, Illinois. According to CW, during the ensuing meeting, QUINTERO showed CW two firearms. The first firearm was a black Chinese SKS rifle with a bayonet and a large capacity magazine and the second firearm was a brown Chinese SKS rifle with a large capacity magazine. CW informed QUINTERO that CW did not currently have the money purchase the two firearms, but that

---

[3] QUINTERO and CW talked by telephone later that evening. The call was not recorded. According to CW, QUINTERO told CW that he (QUINTERO) would be unable to meet the following day and told CW that CW could directly contact the firearm supplier. QUINTERO also provided CW with a telephone number for the supplier. CW subsequently contacted the purported supplier at the telephone number provided by QUINTERO, but was unable to arrange a meeting.

he would have the money soon. CW told QUINTERO that CW would contact him on the following Monday, which was March 28, 2011.

11.     On March 28, 2011, at approximately 10:43 a.m., CW placed a consensually monitored and recorded telephone call to QUINTERO. During the ensuing call, CW told QUINTERO that CW had the money for the "toys," which CW explained was a reference to the two firearms that QUINTERO had previously shown to CW. QUINTERO and CW then discussed the price of the "toys." QUINTERO told CW that the cost for the first "toy" would be $1,000 and the cost for the second "toy" would be $1,200. CW explained to QUINTERO that CW would be bringing a client to purchase the firearms and that CW had told the client that the cost of the firearms was $1,300 each. CW told QUINTERO that, after CW's client paid QUINTERO, QUINTERO should give CW the additional money. CW also asked QUINTERO about the possibility of acquiring "boxes," which CW explained was a reference to ammunition, and "papers," which CW explained was a reference to identification documents. CW and QUINTERO agreed to meet on Tuesday, which was March 29, 2011, at approximately 12:00 p.m.[4]

### *Purchase of Firearms from QUINTERO and Obtaining a Sample of Cocaine*

12.     CW and QUINTERO engaged in multiple consensually monitored and recorded telephone conversations in the morning and early afternoon of March 29, 2010.

---

[4]     During subsequent recorded telephone discussions later that day, March 28, 2011, QUINTERO told CW that his contact did not have any identification documents, but that he would attempt to reach someone else about obtaining identification documents.

During the course of these discussions, they agreed to meet at a restaurant located on Liberty Street in Elgin, Illinois.

13.     At approximately 1:00 p.m. that afternoon, March 29, 2011, ICE agents set up surveillance in the area of the Liberty Street restaurant referenced by QUINTERO. At that time, ICE agents observed a Hispanic male, later identified as Jose, standing outside the Liberty Street restaurant with QUINTERO.

14.     At approximately 1:05 p.m., UCA and CW arrived at the restaurant in a vehicle being driven by UCA. UCA had been equipped with an audio and video recording device prior to this meeting. Upon their arrival, QUINTERO entered the rear passenger seat of the undercover vehicle and provided directions to a residence on Standish Street in Elgin. UCA and CW then drove with QUINTERO to the residence and, upon their arrival, went into the residence with QUINTERO.

15.     Inside of the residence, QUINTERO showed two firearms to UCA and CW. The first firearm was a black Chinese SKS rifle with a bayonet and a large capacity magazine, which was later determined to have a thirty cartridge capacity. The second firearm was a brown Chinese SKS rifle with a large capacity magazine, which was later determined to have a thirty cartridge capacity.

16.     Upon examining the firearms, QUINTERO and UCA discussed the price for the firearms. QUINTERO told UCA that the cost for the two rifles was "two, six," which UCA understood to mean $2,600. This was the same price that QUINTERO had quoted to

-7-

CW during their prior phone conversation. UCA then paid QUINTERO $2,600 in government issued funds for the purchase of the two rifles. Following the exchange of money, UCA and QUINTERO left the residence with the two rifles, which had been wrapped in black plastic bags by QUINTERO, and walked to UCA's vehicle, where UCA opened the trunk and QUINTERO placed the rifles inside of the trunk.

17. UCA and QUINTERO went back inside the residence after placing the two firearms in the trunk of UCA's vehicle. While inside the residence, the Hispanic male who had been with QUINTERO at the Liberty Street restaurant entered the residence. QUINTERO and this Hispanic male, who QUINTERO referred to as "Jose," walked into a back room. After a few minutes, QUINTERO and "Jose" walked out of the room, with "Jose" carrying a plastic bag containing a white powdery substance. "Jose" left the residence.

18. After "Jose" left, QUINTERO informed UCA and CW that he had some cocaine in his possession. QUINTERO then brought out a white powdery substance in "brick-form" that he indicated was cocaine. QUINTERO broke off a small amount of the white powdery substance as a sample and gave it to UCA. UCA accepted the sample and left the residence with CW.

19. At approximately 3:15 p.m., agents met with UCA and CW at a predetermined staging location. The white powdery substance was field tested and tested positive for cocaine. The white powdery substance and its packaging weighed approximately 1.2 grams.

### *Meeting with QUINTERO to Discuss Purchase of Cocaine*

20.     UCA exchanged multiple telephone calls and text messages with QUINTERO between April 12, 2011 and April 28, 2011 for the purpose of arranging the purchase of cocaine from QUINTERO. During the course of these communications, QUINTERO and UCA discussed obtaining "shirts," which UCA explained was a reference to kilograms of cocaine. Over the course of additional phone conversations on April 27, 2011 and the morning of April 28, 2011, UCA and QUINTERO agreed to meet at a restaurant on Summit Street in Elgin to further discuss UCA's purchase of cocaine from QUINTERO.

21.     On April 28, 2011, at approximately 12:14 p.m., QUINTERO met with UCA and a second undercover agent (hereinafter referred to as "UCA-2") inside of the restaurant on Summit Street in Elgin. UCA and UCA-2 had audio and video recording devices placed on them prior to the meeting. During the ensuing meeting, among other things, UCA and UCA-2 talked to QUINTERO about the cocaine that they wanted to purchase. QUINTERO asked UCA and UCA-2 "how many do you want? . . .two? . . .three?," which UCA and UCA-2 understood to be a reference to the number of kilograms they wanted to purchase. UCA-2 responded that, "Like I said, two or three to start off with to gain trust, you know? I can easily . . .no problem. I have a lot of people calling me, my regulars." Later in the conversation, QUINTERO stated that "I'll call my buddy then." UCA-2 replied, "Yes, tell him two, three to start," which UCA-2 explained was a reference to purchasing two to three kilograms of cocaine to start.

### *Purchase of Cocaine on May 4, 2011*

22.     On May 3, 2011, at approximately 5:26 p.m., UCA placed a consensually recorded telephone call to QUINTERO for the purpose of arranging the purchase of cocaine from QUINTERO. During the ensuing conversation, QUINTERO told UCA to meet him the following morning at the residence on Standish Street in Elgin. QUINTERO stated that he would bring UCA to his "supplier" for the cocaine.

23.     On May 4, 2011, at approximately 10:38 a.m., UCA and UCA-2 arrived at the Standish Street residence in Elgin. UCA and UCA-2 had audio and video recording devices placed on them prior to the meeting. Upon their arrival, QUINTERO entered the front seat of the vehicle being driven by UCA-2. UCA was in the rear passenger seat of the vehicle. QUINTERO appeared to speak with someone over a cellular phone as they drove and ultimately directed UCA-2 to drive to an area in Carpentersville, Illinois.

24.     Once in Carpentersville, QUINTERO directed UCA-2 to an area near the intersection of Sioux Avenue and Navajo Drive. Once there, at QUINTERO's direction, UCA-2 pulled the vehicle over to the curb, where an individual later identified as ISIDRO BUENROSTRO-MORA was standing. BUENROSTRO-MORO then entered the vehicle and sat in the back seat along with UCA.

25.     After BUENROSTRO-MORA entered the vehicle, BUENROSTRO-MORA directed UCA-2 to drive the vehicle to a nearby residence, XX8 Sioux Avenue,[5] which was

---

[5] The full address has been redacted.

about a block away. Pursuant to BUENROSTRO-MORO's instructions, UCA-2 drove the vehicle to the residence at XX8 Sioux Avenue and parked in front of the residence. Everyone then exited the vehicle and BUENROSTRO-MORO stated that he had to contact his "guy."

26.     ISRAEL MELCHOR-QUINTANA was standing in the front yard of the XX8 Sioux Avenue residence when everyone arrived. As QUINTERO, BUENROSTRO-MORO, and MELCHOR-QUINTANA stood in the front yard area of the residence, BUENROSTRO-MORO appeared to make a telephone call using a cellular phone. At one point, MELCHOR-QUINTANA entered the residence and returned with four drinks.

27.     Shortly after BUENROSTRO-MORO was observed using a cellular phone, a silver 2002 Pontiac Grand Prix driven by Individual A pulled onto the driveway of the residence.

28.     At that time, QUINTERO, BUENROSTRO-MORA, and MELCHOR-QUINTANA, as well as UCA and UCA-2, gathered near the Pontiac. MELCHOR-QUINTANA then told Individual A to release the lock on the hood of the Pontiac, which allowed BUENROSTRO-MORO to retrieve a black plastic bag from inside of the engine block area.

29.     After BUENROSTRO-MORO removed the black plastic bag from the engine block, Individual A got out of the Pontiac. UCA and UCA-2 asked to inspect the quality of the cocaine. UCA and UCA-2 asked to do so in the car, but BUENROSTRO-MORO stated

that he did not want them to look at it outside and told everyone to go into the residence. QUINTERO, BUENROSTRO-MORA, and MELCHOR-QUINTANA, as well as UCA, then entered the residence. Individual A remained outside with UCA-2 when the others went into the residence.

30. Once inside of the residence, QUINTERO, BUENROSTRO-MORA, MELCHOR-QUINTANA, and UCA went to table located in the kitchen area, where BUENROSTRO-MORA removed three bricks of a white powdery substance that was wrapped in plastic from the plastic bag that he retrieved from the Pontiac. Each brick was approximately 12" in length by 7" inches in width. BUENROSTRO-MORO then allowed UCA to cut into the bricks in order to inspect the cocaine. UCA observed a white powdering substance that appeared to be cocaine when he cut into the brick. QUINTERO, BUENROSTRO-MORA, and MELCHOR-QUINTANA remained in the room and watched UCA as he cut open the brick of cocaine.

31. After inspecting the cocaine, UCA asked for something to reseal the brick. MELCHOR-QUINTANA responded to UCA's request and tape. UCA then asked for something to place the bricks of cocaine in, and MELCHOR-QUINTANA again responded and provided a shirt, which was used to wrap the brick.

32. After resealing the brick, UCA told QUINTERO, BUENROSTRO-MORO, and MELCHOR-QUINTANA that he had the money outside. QUINTERO, BUENROSTRO-MORO, and MELCHOR-QUINTANA then left the residence with UCA

and walked towards the vehicle that had been driven by UCA-2. The arrest signal was given at that time and QUINTERO, BUENROSTRO-MORO, and MELCHOR-QUINTANA were placed under arrest in front of the XX8 Sioux Avenue residence.

33.     Agents recovered the three packages of white powdery substance that BUENROSTRO-MORO obtained from the Pontiac. The substance field tested positive for the presence of cocaine.

### *Post-Arrest Statements*

34.     Following the arrest, law enforcement officers interviewed QUINTERO. QUINTERO was advised of his *Miranda* rights and agreed to speak with law enforcement officers. During the interview, QUINTERO acknowledged that, among other things, he met with BUENROSTRO-MORO the day before his arrest to discuss selling three kilograms of cocaine to the individuals who QUINTERO now understood to be law enforcement officers. QUINTERO stated that BUENROSTRO-MORO agreed to provide the cocaine for the deal and to pay QUINTERO $500 for his assistance in connection with the transaction. BUENROSTRO-MORO also told QUINTERO that he could make more money in the future for arranging additional transactions. QUINTERO stated that he called BUENROSTRO-MORO as QUINTERO was in the vehicle with UCA and UCA-2 in order to obtain directions from BUENROSTRO-MORO.

35.     Based upon the foregoing, the undersigned submits that there is probable cause to believe that ADOLFO QUINTERO, ISIDRO BUENROSTRO-MORO, and ISRAEL

MELCHOR-QUINTANA have conspired to knowingly and intentionally distribute a controlled substance, namely, 500 grams or more of a mixture containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2.

FURTHER AFFIANT SAYETH NOT.

PAUL T. SCHEICH
Special Agent
Immigration & Customs Enforcement

SUBSCRIBED AND SWORN to before me on May 5, 2011.

SUSAN E. COX
United States Magistrate Judge

-14-